# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| PHYLLIS ANDERSON, *et. al.*, | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 07-1165 |
| | : | |
| THE BAKERY AND CONFECTIONERY UNION | : | |
| AND INDUSTRY INTERNATIONAL PENSION | : | |
| FUND, *et. al.*, | : | |
| Defendants. | : | |

## Memorandum

YOHN, J.                                                      September 3, 2009

Plaintiffs, eighteen women who are current or former employees of Nabisco, Inc., bring this action on behalf of themselves and a class of similarly situated women[1] against three defendants: the Bakery and Confectionery Union and Industry International Pension Fund (the "Plan"); the Board of Trustees of the Bakery and Confectionery Union and Industry International Pension Fund ("Plan Administrator" or "Board of Trustees"); and the Appeals Committee of the Board of Trustees ("Appeals Committee"). Pursuant to 29 U.S.C. § 1132(a), the civil enforcement provision of the Employee Retirement Income Security Act ("ERISA"), plaintiffs seek pension benefits that they allege defendants improperly denied them and injunctive relief.

Presently before the court is a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by two of the

---

[1] Plaintiffs have not yet filed a motion to certify the proposed group of women as a class.

three defendants: the Plan and the Board of Trustees.[2]  For the reasons set forth below, the court

will grant in part and deny in part the motion.[3]

## I.      Factual and Procedural Background[4]

The history of plaintiffs' present case relates to several earlier proceedings.

### A.      The *Karan* Action

Plaintiffs, current or former employees at Nabisco, Inc.'s Philadelphia bakery whose

Nabisco employment began in the 1960s and 1970s, participated in the settlement of a class

action against Nabisco.  (Am. Compl. ¶¶ 2, 31-34).  The class action—*Karan v. Nabisco, Inc.*,

Nos. 75-1356 and 77-927 (W.D. Pa.) (*see* Am. Compl. ¶ 31)—raised more than seventeen

allegations of discrimination.  One of the allegations was that Nabisco maintained gender-

segregated seniority lists and, "in instances of plant layoff, laid off all employees from the female

seniority list before laying off any employee from the male seniority list" (Am. Compl. ¶ 29

(emphasis omitted)).  Under this practice, plaintiffs were repeatedly laid off for periods of

months and subsequently rehired.  (*See* Am. Compl. ¶ 46 (listing, year by year, the number of

months each of the eighteen plaintiffs was laid off).)

The *Karan* court approved a Stipulation and Settlement Agreement (the "*Karan*

_____

[2] The Appeals Committee—the third defendant in this action—did not join in the motion to dismiss.  (Defs.' Mot. Dismiss Pls.' Am. Compl. (Doc. No. 29).)

[3] This action was reassigned to me on April 29, 2009.  I held a status conference on May 13, 2009.

[4] The court draws the facts described herein from plaintiffs' allegations.  As discussed in section II, below, for the purposes of this motion the court accepts as true all well-pleaded allegations in plaintiffs' amended complaint and views all reasonable inferences in the light most favorable to plaintiffs.

Settlement Agreement") on January 28, 1982.  (*Id.* ¶ 34; Defs.' Mot. Dismiss (Doc. No. 10) Ex. C (the *Karan* Settlement Agreement).)  Pursuant to the *Karan* Settlement Agreement, Nabisco set aside a $4.9 million settlement fund (*Karan* Settlement Agreement ¶ 8) to be distributed among all class claimants as follows:[5] after paying the *Karan* plaintiffs' attorneys' fees, expenses, and costs as well as monetary payments to the named *Karan* plaintiffs and certain class members who had filed charges then pending before the EEOC, the balance of the settlement fund was distributed to the remaining *Karan* class members who submitted claims (termed "Eligible Claimants") based on "Distribution Units."  (*Karan* Settlement Agreement ¶ 9.)  A stipulated formula "based upon the relative lengths of time during which [the Eligible Claimants] worked for [Nabisco] at any time between November 17, 1971 and the date of [the *Karan* Settlement Agreement]" determined the individual distribution paid to each Eligible Claimant. (*Id.* ¶ 9(d).)

In summary, two schedules enumerated the number of Distribution Units to be credited to each Eligible Claimant for each month that the Claimant held a particular job classification.  One schedule applied to months between November 17, 1971 (the beginning of the covered Settlement Agreement period) and December 31, 1975.  (*Id.* ¶ 9(d)(ii).)  The other schedule applied to months between January 1, 1976[6] and the end of the covered Settlement Agreement

---

[5] Payments to all *Karan* plaintiffs were "less the employee's appropriate share of taxes." (*Karan* Settlement Agreement ¶¶ 9(b)-(d).)

[6] Subject to a few exceptions inapplicable here, certain portions of ERISA dealing with participation and vesting, including 29 U.S.C. § 1052(a)(3)(C), which empowered the Secretary of Labor to define an "hour of service," apply only to "plan years beginning after December 31, 1975." 29 U.S.C. § 1061(b)(2).  Thus, as the parties agree and as discussed in section III of this Memorandum, the law governing the Plan changed on January 1, 1976.

period.  (*Id.* ¶ 9(d)(i).)  Certain job classifications garnered more Distribution Units than others, (*id.* ¶ 9(d)(i)-(ii)), and for most job classifications, the schedules credited Eligible Claimants more Distribution Units for months in the pre-1976 period than for months in and after 1976, (*id.* ¶ 9(d)(i)-(ii)).

> Importantly for plaintiffs' present action, the *Karan* Settlement Agreement stated that:

> Periods of layoff, disability, pregnancy, or other types of absence (unless and until the person was treated as terminated) will be considered (solely for the purposes of this distribution) as though the person were still in the last classification (prior to the absence) recorded [in Nabisco's employment history records for that person].  In other words, persons will receive payments regarding periods of layoff, disability, pregnancy, and other absences.

(*Id.* ¶ 9(d)(v).)  Thus, the settlement payment that each Eligible Claimant received was based on length of service, but accounted for, *inter alia*, periods of layoff.  The monetary distribution paid to each Eligible Claimant was then calculated by: (1) determining the ratio of an "Eligible Claimant's Distribution Units to the total Distribution Units credited to all Eligible Claimants," (*id.* ¶ 9(d)(iv)), and (2) multiplying that ratio by the amount of money remaining in the settlement fund after payment of the priority claims described above, (*id.* ¶ 9(d)).  The *Karan* Settlement Agreement also stated that:

> The monetary payments to which an Eligible Claimant is entitled upon application of the formula will not be included by [Nabisco] in any compensation base for computing employment benefits available to any Eligible Claimant.

(*Id.* ¶ 9(f).)

> In addition to distribution of the settlement fund, the *Karan* Settlement Agreement set forth numerous remedial measures related to the *Karan* plaintiffs' allegations of discrimination. Those allegations touched on many aspects of employment practices at Nabisco, only one of

which was the alleged practice of discriminatory layoffs.[7]

In the present action, plaintiffs characterize the distributions they received under the *Karan* Settlement Agreement as back pay and claim that, under ERISA and the Rules and Regulations of the Plan, they are entitled to pension credit corresponding to the periods of

_____

[7] The Notice of Proposed Settlement of Class Action and of Settlement Hearing sent to the *Karan* class members included a non-exhaustive list of seventeen forms of alleged discrimination:

- having a workforce where women were placed and maintained in certain jobs while men were placed and maintained in other higher-paying jobs;
- training newly-hired women to work primarily in such lower-paying jobs as packers and general help while training newly-hired men to work as higher-paying floor helpers;
- failing to place women in certain departments with the highest-paying jobs;
- maintaining a system of departmental seniority at some bakeries;
- not allowing female employees to bid on certain jobs and/or discouraging those women who did bid from remaining in those jobs;
- allowing male employees to harass, or not preventing male employees from harassing women and/or failing to train women to work in certain jobs in the bakeries;
- posting some jobs for bid on only a departmentwide basis;
- discriminating against salaried women in the setting of salaries and salary ranges;
- paying foreladies, assistant forewomen and forewomen less than male supervisors with equal experience in supervision;
- discriminating against production women by setting the wage rate for jobs held by production women at a discriminatory level in relation to other jobs held by men;
- paying production women less than production men for work substantially equal in skill, effort and responsibility and performed under similar working conditions;
- affording women fewer opportunities to earn overtime than men;
- laying off women from work for more days than men with equal or less seniority;
- failing to promote women into supervision at the same rate as men;
- failing to promote assistant forewomen and foreladies to forewomen at the same rate assistant foremen were promoted to foremen;
- discriminating against women in the area of fringe benefits;
- engaging in acts of discrimination against individual women.

(Defs.' Mot. Dismiss (Doc. No. 10) Ex. C (Class Notice pp. 2-3).)

discriminatory layoff "encompassed in the period for which back pay was given." (Am. Compl. ¶¶ 37-38.) Specifically, plaintiffs claim entitlement to: "(a) increased pension payments going forward; (b) recovery of under-payments for past pension payments that were lower than they should have been; (c) earlier eligibility for pension benefits; and (d) eligibility for higher pension payments." (*Id.* ¶¶ 99, 102.) Plaintiffs seek such relief in Count I of their Amended Complaint under 29 U.S.C. § 1132(a)(1)(B) and in Count II as injunctive relief under 29 U.S.C. § 1132(a)(3).

Defendant Plan is a multi-employer defined benefit plan, (*id.* ¶ 23),[8] and defendant Board of Trustees "serves as the Plan Administrator of the Plan under ERISA," (*id.* ¶ 24). The Board of Trustees consists of ten members appointed by the employers that participate in the Plan and ten members appointed by the union. Defendant Appeals Committee consisted of Frank Hurt, Chairman of the Board of Trustees, and Dick Cook, Secretary of the Board of Trustees. (*Id.* ¶ 25.) Presumably, one member of the Appeals Committee was an employer appointee and the other member was a union appointee. Plaintiffs are participants in and beneficiaries of the Plan. (*Id.* ¶ 3.)

**B.      The *Wilson* Action**

In January 2001, the plaintiffs in this present action initiated a lawsuit against the Board of Trustees, Nabisco, and Phillip Morris, Inc. (which had become Nabisco's corporate parent) in which plaintiffs claimed they had been denied certain pension benefits owed to them. *Wilson v. Nabisco, Inc.*, No. 01-415 (E.D. Pa.). In *Wilson*, as in the present action, plaintiffs sought pension credit, "alleging, *inter alia*, that the payments they received under the *Karan* Settlement

_____

[8]The record does not disclose the names or total number of employers that, at any time, participated in the Plan.

Agreement constituted back pay for periods of discriminatory layoffs, and that they were wrongfully denied pension credit they were due under the Plan as a result of this back pay." (Am. Compl. ¶ 40.)  The district court granted Nabisco's motion to dismiss and entered judgment in favor of the *Wilson* defendants.  *Wilson v. Nabisco*, No. 01-415, 2002 WL 32351159 (E.D. Pa. April 2, 2002); (Am. Compl. ¶ 41).  The court based its decision on its determinations that (1) "the *Karan* Settlement distributions were not intended to be 'hours of service' for back pay" within the meaning of ERISA, *Wilson*, 2002 WL 32351159 at *6-*8, and (2) the release in the *Karan* Settlement Agreement served to bar plaintiffs' claims, *id.* 2002 WL 32351159 at *8-*10.[9]

On appeal, however, the Third Circuit vacated the district court's decision on December 8, 2003 and remanded "with directions to dismiss the complaint without prejudice to the right of the plan participants to present their claims for pension credits to the Plan in the first instance." *Wilson v. Nabisco*, 82 F. App'x 282, 284 (3d Cir. 2003.)  Explaining that "an ERISA plan participant making a claim for benefits pursuant to § 502(a)(1)(B) [codified as 29 U.S.C. § 1132(a)(1)(B)] must exhaust the plan's administrative remedies before seeking judicial relief," the court implicitly determined that the *Wilson* plaintiffs had not satisfied the administrative exhaustion requirement.  *Id.* at 283-84.  The court noted that "at oral argument, the Plan's counsel agreed that the Plan would nonetheless hear and consider the women's claim for pension benefits." *Id.* at 284.

## C.    Administrative Exhaustion

Plaintiffs applied to the Plan on April 30, 2004 for additional pension credit and detailed

---

[9] As listed above, only one of the three *Wilson* defendants—the Board of Trustees—is a defendant in the present action.  The present defendants do not contend in this motion that the release in the *Karan* Settlement Agreement with Nabisco bars the plaintiffs' claims.

for the Plan the specific periods of layoff for which each plaintiff sought pension credit.  (Am. Compl. ¶¶ 45-46.)  The Plan denied plaintiffs' administrative application (the "Initial Denial") on June 16, 2004.  (*Id.* ¶ 51.)  The Plan's explanation of the denial emphasized that the *Karan* distribution payments were intended to settle claims of discrimination by the company, not to provide back pay for periods of layoff.  (*Id.* ¶ 52.)  As to "claims for additional pension benefits for periods before January 1, 1976," the Plan also based its denial "on the ground that no pension fund contributions were made [by Nabisco] on Plaintiffs' behalf during the pre-1976 period." (*Id.* ¶ 54.)

Plaintiffs appealed the Initial Denial through the Plan's internal appeal process (the "Administrative Appeal") on December 22, 2004, arguing that plaintiffs were entitled to additional pension benefits and, moreover, that the *Karan* distribution payments were intended as back pay.  (*Id.* ¶ 56.)  Regarding the pre-1976 period, plaintiffs also argued in the Administrative Appeal that a failure on Nabisco's part to make required contributions on plaintiffs' behalf did not "absolve the Board of Trustees or the Plan's obligations" to plaintiffs.  (*Id.* ¶ 69.)  In support of that second argument, the Administrative Appeal cited a version of the Plan's "Standard Collective Bargaining Clause" that the Plan had represented to plaintiffs was "typical of the clause that would have pertained to Nabisco during the period at issue here."  (*Id.* ¶ 68.)  That version of the clause provides that a participating employer must contribute to the Plan "'[f]or each day or portion thereof, which an employee works . . . or receives pay in lieu of work (such as holiday, vacation, pro rata vacation, and severance pay).'"  (*Id.*)

The Appeals Committee, on behalf of the Board of Trustees, denied the Administrative Appeal on March 22, 2005 (the "Plan Denial").  (*Id.* ¶ 70.)  Plaintiffs attached the Plan Denial, a three-page letter, as Exhibit E to their response to defendants' original motion to dismiss (Pls.'

Mem. Law Opp'n Defs.' Mot. Dismiss (Doc. No. 25) Ex. E ("Plan Denial")).  As to pension benefits sought for periods of layoff prior to 1976, the Appeals Committee explained that, for pre-1976 periods, pension credit under the Plan was "awarded 'on the basis of [a Participant's] days of work in Covered Employment during a Calendar Year on which contributions to the Pension Fund were made,'" and "Nabisco made no contributions to the Pension Fund for the periods of layoff at issue."  (Plan Denial at 1.)

The Appeals Committee further explained that the version of the Standard Collective Bargaining Clause plaintiffs had cited in the Administrative Appeal had not been adopted during the period for which plaintiffs claimed benefits.  Rather, the version of the clause operative in the 1970s and early 1980s required employers to contribute "'[f]or each day or portion thereof, for which an employee, subject to this collective bargaining agreement, receives pay.'"  (*Id.* at 2 n.1.) The Appeals Committee stated that "Nabisco did not report the money it deposited in the *Karan* settlement fund as 'pay' pursuant to this clause."  Based on additional correspondence with the Plan's counsel discussed in section III.A., below, plaintiffs allege that "employees who received 'pay' in lieu of work for the period from January 1973 through Dec. 31, 1975, typically *did* receive pension credit for" such periods.  (Am. Compl. ¶ 83 (original emphasis); *see also id.* ¶¶ 78-82.)

As to pension benefits sought for periods of layoff in and after 1976, "the Appeals Committee determined that the *Karan* settlement payments were not back pay <u>for</u> periods of layoff."  (Plan Denial at 3 (original emphasis).)  The Plan Denial stated that plaintiffs would have received pension credit:

if the [*Karan*] class members received back pay for periods of layoff that satisfied the

definition of "Hours of Service"[10] in Section 1.25 of the Rules and Regulations of the Pension Plan.  That definition includes "each hour <u>for</u> which back pay, irrespective of mitigation of damages, is awarded or agreed to by a Contribution Employer <u>to the extent that such award or agreement is intended to compensate an Employee for periods during which he would have been engaged in the performance of duties for the Contributing Employer</u> . . . ."

(*Id.* at 2 (emphasis in Plan Denial).)  The Plan Denial further explained that the Plan's definition of Hours of Service "is based upon the Department of Labor's regulation 29 C.F.R. § 2530-200b-2(a)(3)."  (*Id.*)

The Appeals Committee focused on the limitation, from Article I, § 1.25 of the Plan's Rules and Regulations, as to whether the *Karan* Settlement Agreement was "intended to compensate an Employee for periods during which [s]he would have been engaged in the performance of duties" for her employer.  The Appeals Committee explained that the *Karan* Settlement Agreement settled at least seventeen allegations of discriminatory practices, only one of which was the discriminatory layoff.  (Plan Denial at 2.)  The "distribution of the settlement fund was explicitly designed to compensate class members for their claims of discrimination in job classifications, promotion, and pay."  (*Id.*)  Specifically, the Plan Denial focused on the formula's equivalent treatment (in terms of the assignment of Distribution Credits) of all of an Eligible Claimant's time at Nabisco—including periods of work, layoff, and other types of absences.  (*Id.* at 3.)  "The formula thus compensated for longevity in each classification."  (*Id.* (emphasis omitted).)  The Appeals Committee concluded that the language in the *Karan* Settlement Agreement that "'persons will receive payments regarding periods of layoff' . .

---

[10] Hours of Service is a metric by which ERISA, through applicable federal regulations, mandates pension credit be calculated.  *See* 29 U.S.C. § 1052(c) ("For purposes of this section, the term 'hour of service' means a time of service determined under regulations prescribed by the Secretary [of Labor]."); 29 C.F.R. § 2530.200b-2(a) (defining "hour of service").

. does not establish that payments were made as back pay <u>for</u> those periods, only that those

periods were included in measuring the longevity in specific job classifications that was the

determining factor in the distribution." (*Id.*)

### D.   The Present Action

Having exhausted their administrative remedies within the Plan, plaintiffs filed the instant

action in which they seek "the vacating and reversal [*sic*]" of the Plan Denial and ask the court to

grant the above enumerated monetary and injunctive relief related to pension benefits as well as

attorneys' fees. (Am. Compl. Requested Relief.)  Before discussing defendants' motion to

dismiss, three provisions concerning the Plan require mention.  First, Article VIII, § 8.04 of the

Plan's Rules and Regulations provides that the Trustees and their committees "have the exclusive

right, power, and authority, in their sole and absolute discretion, to administer, apply and

interpret the Plan and any other Plan documents and to decide all matters arising in connection

with the operation or administration of the Plan." (Defs.' Mot. Dismiss (Doc. No. 10) Ex. B.)

These powers include, but are not limited to, "the sole and absolute discretionary authority to: (a)

take all actions and make all decisions with respect to eligibility for, and the amount of, benefits

payable under the Plan [and] (c) decide questions, including legal or factual questions, relating to

the calculation and payment of benefits under the Plan." (*Id.*)

Second, Article V, § 4 of the Plan's Agreement and Declaration of Trust provides, in

relevant part:

> In addition to any other remedies to which the parties may be entitled, an Employer
> in default for ten working days may be required at the discretion of the Trustees to
> pay such reasonable rate of interest as the Trustees may fix on the moneys due to the
> Trustees from the date when the payment was due to the date when payment is made,
> together with all expenses of collection incurred by the Trustees.  The Trustees may
> take any action necessary to enforce payment of the contributions due hereunder,
> including but not limited to proceedings at law and in equity, including but not

11

limited to reasonable counsel fees.

(Pls.' Mem. Law Opp'n Defs.' Mot. Dismiss (Doc. No. 25) Ex. F at 5.)

Third, Article III, § 1 of the Plan's Agreement and Declaration of Trust provides:

The operation and administration of the Pension Fund shall be the joint responsibility of ten Trustees appointed by the [participating, contributing] Employers and ten Trustees appointed by the [Bakery, Confectionery & Tobacco Workers] International Union.  The number of Trustees may be changed from time to time except that there shall always be an equal number, and except that there shall not be more than ten Employer Trustees and ten Union Trustees.

(*Id.* at 2.)  Thus, half of the Plan's Trustees are appointed by the employers whose contributions fund the Plan and the other half by the Union.  Plaintiffs allege, therefore, that:

The Board of Trustees and its Appeals Committee, in reviewing the Plaintiffs' administrative request for benefits, suffered from an inherent financial conflict of interest in that, if the Board of Trustees or its Appeals Committee had granted Plaintiffs' request, the Plan would face legal and financial pressures, exposure or obligations to, in turn, seek funds and/or contributions from some or all of the individual members of the Board of Trustees, as the Plan is funded by employer contributions.

(Am. Compl. ¶ 26.)[11]

## II.    Standard of Review

### A.    Rule 12(b)(6) Motions

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint.[12]  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  When evaluating a

---

[11] Regarding this allegation, the court notes that the Plan's contributing employers are not the "individual members of the Board of Trustees."  Rather, the contributing employers *appoint* half of the individual members.

[12] In addition to the allegations contained in the complaint, "courts generally consider . . . exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).  Because this case comes before the court following defendants' administrative review of plaintiffs' pension

motion to dismiss, the court must accept as true all well-pleaded allegations of fact in the plaintiff's complaint and must view any reasonable inferences that may be drawn therefrom in the light most favorable to the plaintiff. *See Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008); *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996).

The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). This statement must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations and alterations omitted). Furthermore, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations and footnote omitted); *see also Phillips*, 515 F.3d at 232.

In *Ashcroft v. Iqbal*, the Supreme Court discussed "[t]wo working principles" underlying *Twombly*. 129 S. Ct. 1937, 1949 (2009). "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "Second, only a complaint that states a plausible claim for

---

claims and because plaintiffs' claims before the court turn on the propriety of that administrative review, the exhibits submitted for the court's consideration are significantly more detailed and voluminous than in routine motions to dismiss.

13

relief survives a motion to dismiss." *Id.* at 1950 (citing *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

B.     **Deference to the Board of Trustees**

The parties disagree as to the level of deference that the court must afford to the Plan Denial by the Board of Trustees. Citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), and several decisions from various courts of appeals, defendants argue that, because the Plan gives discretionary authority to the administrator (the Board of Trustees), the court must review the Plan Denial under a deferential arbitrary and capricious standard. (Defs.' Br. Supp. Mot. Dismiss (Doc. No. 10-2) at 12.) Plaintiffs argue that the Plan Denial is entitled to no deference because the Appeals Committee based its decision substantially on its interpretation of the *Karan* Settlement Agreement, which is not a Plan document. (Pls.' Mem. Law Opp'n Defs.' Mot. Dismiss (Doc. No. 25) at 24-25.) Thus, plaintiffs argue the court should engage in *de novo* review of the Appeals Committee's denial. (*Id.*) Alternatively, citing *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377 (3d Cir. 2000), plaintiffs argue that the court should apply a "sliding scale" approach to deference because plaintiffs have alleged that the Appeals Committee made its decision under a structural and financial conflict of interest. (*Id.* at 25-26.) Plaintiffs allege a conflict of interest in that an Appeals Committee "ruling in Plaintiffs' favor might create pressure on the Trustees to, in turn, seek additional contribution from the employer-members of the Board of Trustees." (*Id.* at 26.)

Notably, as to plaintiff's argument for sliding scale deference, the controlling case law on this issue has developed significantly since the parties submitted their most recent briefings on

14

this motion.  The parties, however, have not sought to submit supplemental briefing.  The

Supreme Court has held "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed

under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone*, 489

U.S. at 115 (1989).  The Court further stated that "a deferential standard of review [is]

appropriate when a trustee exercises discretionary powers."  *Id.* at 111.  The Court referred to

such deference as "the arbitrary and capricious standard," *id.* at 112, and stated "[o]f course, if a

benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of

interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of

discretion,'" *id.* at 115 (quoting Restatement (Second) of Trusts § 187, cmt. d (1959)).

      In *Metro. Life Ins. Co. v. Glenn*, the Supreme Court further clarified the *Firestone*

standard, explaining that the "dual role [of determining benefit eligibility and paying benefits]

creates a conflict of interest; that a reviewing court should consider that conflict as a factor in

determining whether the plan administrator has abused its discretion in denying benefits; and that

the significance of the factor will depend upon the circumstances of the particular case."  128 S.

Ct. 2343, 2346 (2008).  The Court further explained that *Firestone*'s statement about weighing

conflicts did not imply "a change in the *standard* of review."  *Glenn*, 128 S. Ct. at 2350 (original

emphasis).  Thus, the potential existence of a conflict of interest is to be considered within the

deferential abuse of discretion standard, but it does not change the standard of review.

      Prior to *Glenn*, the Third Circuit "had used a sliding scale approach to address conflicts of

interest and their impact on the amount of discretion that should be afforded to the decisions of

plan administrators."  *Doroshow v. Hartford Life & Accident Ins. Co.*, --- F.3d ----, No. 08-2836,

2009 WL 2257384, at *3 (3d Cir. July 30, 2009).  Under that standard, which the Third Circuit

described as "a *heightened* arbitrary and capricious review," *Pinto*, 214 F.3d at 393 (emphasis

added), "[t]he greater the evidence of conflict on the part of the administrator, the less deferential

our abuse of discretion standard." *Id.* (internal citation and quotation omitted).  Recently, the

Third Circuit has recognized that *Glenn* implicitly overruled the *Pinto* standard.  *Doroshow*,

2009 WL 2257384, at *4; *see also Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 525 (3d

Cir. 2009) (stating the "'sliding scale' approach is no longer valid" in light of *Glenn*).  Following

*Glenn*, courts considering § 1132(a)(1)(B) cases "should apply a deferential abuse of discretion

standard of review across the board and consider any conflict of interest as one of several factors

in considering whether the administrator or the fiduciary abused its discretion."[13]  *Schwing*, 562

F.3d at 525.

        "Under the arbitrary and capricious (or abuse of discretion) standard of review, the

district court may overturn a decision of the Plan administrator only if it is 'without reason,

unsupported by substantial evidence or erroneous as a matter of law.'" *Abnathya v. Hoffman-La

Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (quoting *Adamo v. Anchor Hocking Corp.*, 720 F. Supp.

491, 500 (W.D. Pa. 1989)).  The Third Circuit further explained that "[t]his scope of review is

narrow, and the court is not free to substitute its own judgment for that of the defendants in

determining eligibility for plan benefits." *Id.* (internal quotation omitted).

---

    [13] The Third Circuit noted that:
        Our prior caselaw referenced an "arbitrary and capricious" standard of review, while
        *Glenn* describes the standard as "abuse of discretion."  We have recognized that, at
        least in the ERISA context, these standards of review are practically identical.
        *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 n.4 (3d Cir.1993)[.]
*Schwing*, 562 F.3d at 526 n.2.  In conformity with the more recent language of *Glenn* and
*Schwing*, the court will refer to the appropriate standard as "abuse of discretion."  *See also
Abnathya*, 2 F.3d at 45 n.4 ("The 'arbitrary and capricious' standard is essentially the same as the
'abuse of discretion' standard.")

As to the dispute over whether the Appeals Committee's reliance on its interpretation of the *Karan* Settlement Agreement renders the Committee's decision susceptible to *de novo* review, the court agrees with defendants' position: the court must review the Appeals Committee's decision under the abuse of discretion (arbitrary and capricious) standard.  In support of its argument that the Appeals Committee's reliance on a non-Plan document allows or requires the court to depart from a deferential standard of review to a *de novo* standard (Pls.' Mem. Law Opp'n Defs.' Mot. Dismiss (Doc. No. 25) at 25), plaintiffs cite the following passage from *Eckersley v. WGAL TV, Inc.*:

> Turning to the release [entered into by the plaintiff and his employer in settlement of an earlier lawsuit to which the benefit plan was not a party], we note at the outset that it is not a pension plan document.  Moreover, it is not a document to which the plan is a party.  Thus there is no basis for an argument that in determining its effect the court owes any degree of deference to the plan administrator's interpretation of it.

831 F.2d 1204, 1210 (3d Cir. 1987).

While *Eckersley* has not been formally overruled, defendants rightly point out that, following *Firestone*, the Third Circuit has moved away from its approach in *Eckersley*.  In *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 438 (3d Cir. 1997), the Third Circuit held that a plan provision granting to the plan administrator "full discretionary authority to determine all questions arising in the administration, interpretation and application of the plan" was "sufficient to preclude *de novo* review of both interpretative and factual determinations made in the course of applying the benefit provisions of the Plan to a particular application for benefits."  Further, the Third Circuit reasoned that "'application' of the Plan, like 'application' of the law, must encompass the resolution of factual disputes as well as the interpretation of the governing provisions of the plan."  *Id.* at 439.  Accordingly, the *Mitchell* court reviewed the administrator's decision to deny the plaintiff benefits—a decision the administrator had reached on a record of

17

evidence containing medical (non-plan) documentation[14]—under the deferential arbitrary and capricious standard.  *Id.* at 440-43.  In the instant case, Article VIII, § 8.04 of the Plan's Rules and Regulations provides the Trustees and their committees with "the exclusive right, power, and authority, in their sole and absolute discretion, to administer, <u>apply</u> and interpret the Plan and any other Plan documents and to decide all matters arising in connection with the operation or administration of the Plan."  (Defs.' Mot. Dismiss (Doc. No. 10) Ex. B.)

As explained in section I.D., above, the Trustees have broad discretionary authority over eligibility determinations and "factual questions, relating to the calculation and payment of benefits under the Plan."  (Defs.' Mot. Dismiss (Doc. No. 10) Ex. B, § 8.04.)  Therefore, following *Firestone*, *Glenn*, *Schwing*, and *Doroshow* and consistent with *Mitchell*, the court will review the Plan Denial—which is based in substantial part on the Appeals Committee's interpretation of the *Karan* Settlement Agreement—under the deferential abuse of discretion standard.

## III. Discussion

At this procedural stage, it is not for the court to decide whether the Appeals Committee or the Board of Trustees actually abused its discretion by issuing the Plan Denial.  Nor is the case ripe for the ultimate determination of whether the Plan owes additional pension benefits to plaintiffs.  Rather, at this stage, the court must determine whether plaintiffs have met their procedural burden in opposing a motion to dismiss.  That is, the court must determine whether plaintiffs have alleged facts that, taken as true, "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Here, then, defendants' motion must fail if plaintiffs have

---

[14] The record reviewed in *Mitchell* included the plaintiff's medical records as well as statements and letters submitted by physicians in support of the plaintiff's administrative claim.

"state[d] a plausible claim for relief." *Iqbal*, 129 S. Ct. at 1950.  In other words, the question is whether "the well-pleaded facts . . . permit the court to infer more than the mere possibility" that the Appeals Committee or Board of Trustees abused its discretion by issuing the Plan Denial.  *Id.* As the Plan Denial provided separate justifications for defendants' decisions regarding benefits sought for periods of layoff before and after January 1, 1976, the court will also address those periods separately.

### A.     Pension Benefits Sought for the Periods of Layoff before 1976

As discussed above in section I.C., the Plan Denial set forth a single reason for the Appeals Committee's decision as to benefits sought for periods of layoff before 1976. Specifically, the Appeals Committee explained that, for pre-1976 periods, pension credit under the Plan was "awarded 'on the basis of [a Participant's] days of work in Covered Employment during a Calendar Year on which contributions to the Pension Fund were made,'" and "Nabisco made no contributions to the Pension Fund for the periods of layoff at issue."  (Plan Denial at 1.) Thus, the Plan Denial stated that the Plan owed no pension benefits to plaintiffs for pre-1976 layoffs because Nabisco made no contributions to the Plan based on the *Karan* settlement payments.  Upon review of the record, the court concludes that plaintiffs have failed to raise a plausible claim that this decision constitutes an abuse of discretion.  Therefore, the court will grant defendants' motion as to benefits sought for periods of layoff before 1976.

Plaintiffs allege that "documents supplied by counsel for the Plan—covering the period from 1971 through late 1981—demonstrated a clear pattern . . . that employees . . . receive[d] pay for numerous periods for which they did not work, including: (a) payment for absence due to death in the family; (b) payment for holidays and vacation; (c) payment for jury duty."  (Am. Compl. ¶ 80.)  Plaintiffs further allege that when asked "whether pension fund contributions were

19

made on employee's behalf for these days for which employees received pay but did not work" between 1971 and 1981, "the Plan (through counsel) responded that it was 'highly probable that most contributing employers have remitted the required contributions for such paid non-work periods.'" (*Id.* ¶¶ 81-82.)  The Plan's counsel "further stated that, before the effective date of ERISA, the Plan granted pension credit for non-work time '*when the employer actually made contributions covering that time, but not otherwise*.'" (*Id.* ¶ 82 (emphasis added).)

Plaintiffs go on to allege that "employees who received 'pay' in lieu of work for the period from January 1973 through Dec. 31, 1975, typically *did* receive pension credit for" paid non-work periods.  (Am. Compl. ¶ 83 (original emphasis).)  The court, of course, takes this allegation as true at this procedural stage.  Based on the above allegations, plaintiffs further allege that, by failing to award plaintiffs pension credit for the pre-1976 period covered by the *Karan* Settlement Agreement, the Plan treated them differently than similarly situated employees. (*Id.*)  Thus, plaintiffs assert that they were treated differently, compared to other beneficiaries in the pre-1976 period.  While actual allegations of inconsistent treatment of similarly situated individuals—which could be an arbitrary and capricious act—could constitute a plausible claim of abuse of discretion, the court must determine whether the Plan Denial could be found to be arbitrary and capricious based on the administrative record and the allegations of the amended complaint.

Examination of the amended complaint reveals that plaintiffs have not, in actuality, alleged that they were treated differently from similarly situated employees.  At most, plaintiffs allege that they were treated differently from *differently* situated employees.  Plaintiffs allege that some employees received pension credit for non-work time "when the employer actually made contributions covering that time, but not otherwise."  Plaintiffs do *not* allege that employees

20

received pension credit for non-work time—paid or otherwise—for which the employer made no corresponding contribution to the plan.  There has been no allegation that Nabisco made contributions to the Plan corresponding to the *Karan* Settlement Agreement.[15]  Thus, plaintiffs were not situated similarly to other employees who were paid for non-work time *and for whom Nabisco made corresponding contributions to the Plan*.  Accordingly, that such other employees may have received pension credit for time not worked does not establish that plaintiffs possess an entitlement to pension credit for the pre-1976 periods of layoff.  Rather, the allegations of the amended complaint, taken as true, establish that plaintiffs were not treated differently from similarly situated employees because the other employees with whom plaintiffs seek to contrast their treatment were not similarly situated to plaintiffs.  As alleged, the Plan treated plaintiffs in conformity with its own policies regarding pre-1976 periods of layoff.

Moreover, there is no allegation that "contributions to the Pension Fund were made" by Nabisco for the pre-1976 periods of layoff (a requirement of the Plan).  Therefore, the court cannot infer that the Appeals Committee or the Board of Trustees abused their discretion in issuing the Plan Denial as to the pre-1976 period, and the court will grant defendants' motion as to plaintiffs' claims for pension credit for periods of layoff before 1976.

### B.    Pension Benefits Sought for the Periods of Layoff in and after 1976

The Plan Denial set forth separate reasons (not tied to whether an employer made corresponding contributions) for the Appeals Committee's decision as to benefits sought for periods of layoff in and after 1976.  As explained in footnote 6, above, portions of ERISA did not apply to plan years beginning before January 1, 1976.  29 U.S.C. § 1061(b)(2) (stating that,

---

[15]  Indeed, the record contains evidence that Nabisco made no such corresponding contributions.

subject to a few exceptions inapplicable here, the provisions of Title 29, Chapter 18, Subchapter I, Subtitle B, Part 2 of the United States Code (§§ 1051-1061) apply "in the case of plan years beginning after December 31, 1975"). One such portion was 29 U.S.C. § 1052(a)(3)(C), which empowered the Secretary of Labor to define an "hour of service." The parties agree that, for periods in or after 1976, the pension credit owed to an ERISA plan participant depends on the number of "hours of service" creditable to that participant. (Pls.' Mem. Law Opp'n Defs.' Mot. Dismiss (Doc. No. 25) at 12; Defs.' Mot. Dismiss (Doc. No. 10) at 16.)

The Department of Labor has established three definitions for the hour of service metric:

(1) An hour of service is each hour for which an employee is paid, or entitled to payment, for the performance of duties for the employer during the applicable computation period.

(2) An hour of service is *each hour for which an employee is paid, or entitled to payment, by the employer on account of a period of time during which no duties are performed* (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), *layoff*, jury duty, military duty or leave of absence. Notwithstanding the preceding sentence,

(i) No more than 501 hours of service are required to be credited under this paragraph (a)(2) to an employee on account of any single continuous period during which the employee performs no duties (whether or not such period occurs in a single computation period);

(ii) An hour for which an employee is directly or indirectly paid, or entitled to payment, on account of a period during which no duties are performed is not required to be credited to the employee if such payment is made or due under a plan maintained solely for the purpose of complying with applicable workmen's compensation, or unemployment compensation or disability insurance laws; and

(iii) Hours of service are not required to be credited for a payment which solely reimburses an employee for medical or medically related expenses incurred by the employee.

For purposes of this paragraph (a)(2), a payment shall be deemed to be made by or due from an employer regardless of whether such payment is made by or due from the employer directly, or indirectly through, among others, a trust fund, or insurer,

to which the employer contributes or pays premiums and regardless of whether contributions made or due to the trust fund, insurer or other entity are for the benefit of particular employees or are on behalf of a group of employees in the aggregate.

(3) An hour of service is *each hour for which back pay*, irrespective of mitigation of damages, *is either awarded or agreed to by the employer*. The same hours of service shall not be credited both under paragraph (a)(1) or paragraph (a)(2), as the case may be, and under this paragraph (a)(3). Thus, for example, an employee who receives a back pay award following a determination that he or she was paid at an unlawful rate for hours of service previously credited will not be entitled to additional credit for the same hours of service. Crediting of hours of service for back pay awarded or agreed to with respect to periods described in paragraph (a)(2) shall be subject to the limitations set forth in that paragraph. For example, no more than 501 hours of service are required to be credited for payments of back pay, to the extent that such back pay is agreed to or awarded for a period of time during which an employee did not or would not have performed duties.

29 C.F.R. § 2530.200b-2(a) (emphasis added).[16]

As to periods of layoff in and after 1976, the Plan Denial—and a significant portion of defendants' briefing—focused on the definitions of an hour of service from § 1.25 of the Plan's Rules and Regulations and from 29 C.F.R. § 2530.200b-2(a)(3). Based on those definitions, defendants argue that the *Karan* settlement payments did not trigger an entitlement to hours of service because the *Karan* parties did not *intend* the settlement payments as back pay for periods of layoff. Defendants correctly assert that § 1.25(b) requires an element of intent: defining an hour of service to include "each hour for which back pay . . . is awarded or agreed to by a Contributing Employer to the extent that such award or agreement is *intended* to compensate an Employee for periods during which he would have been engaged in the performance of duties for the Contributing Employer." (emphasis added).

The court also notes that the use of the "agreed to" language in § 2530.200b-2(a)(3)

---

[16] It is undisputed that the definition of an hour of service found in § 2530.200b-2(a)(1) is not relevant in the present case because, of course, plaintiffs did not work during the periods of layoff.

23

suggests that intent may be required to satisfy that definition of an hour of service.[17]  Upon

careful review of the record, the court concludes that plaintiffs have not stated a plausible claim

that the Appeals Committee (and the Board of Trustees, in adopting the Appeals Committee's

decision) abused its discretion by determining that the *Karan* settlement payments did not entitle

plaintiffs to hours of service under § 2530.200b-2(a)(3).  The *Karan* Settlement Agreement

established a formula under which the *Karan* plaintiffs received payments in settlement of their

outstanding claims against Nabisco.  As the court quoted in footnote 7 of this Memorandum, the

*Karan* Class Notice included a non-exhaustive list of seventeen discrimination allegations raised

in *Karan*, only one of which was discriminatory layoff.  The *Karan* Settlement Agreement

featured an extensive array of remedial measures for Nabisco to implement, yet it contained no

provision expressly requiring Nabisco to make contributions to the Plan corresponding to the

settlement payments, nor did it make any mention of eligibility for increased pension benefits.

The *Karan* settlement payments were based on each Eligible Claimant's length of service, which

included periods of layoff, but were not based exclusively or even predominantly on periods of

layoff.  Moreover, ¶ 9(f) of the *Karan* Settlement Agreement stated that Nabisco would not

include settlement payments "in any compensation base for computing employment benefits."

Given these circumstances, plaintiffs have not stated a plausible claim that defendants committed

an abuse of discretion by concluding that the *Karan* settlement payments did not constitute back

---

[17] As mentioned, § 2530.200b-2(a)(3) defines an hour of service to include "each hour for which back pay . . . is either *awarded* or agreed to." (emphasis added).  During the Administrative Appeal, plaintiffs noted that "[b]ecause the *Karan* [Settlement Agreement], unlike other settlements, was required to be approved by the presiding court, the back pay also may be considered to have been 'awarded,' as well as agreed to."  (Pls.' Mem. Law Opp'n Defs.' Mot. Dismiss (Doc. No. 25) Ex. D at 3 n.6.)  Plaintiffs have not provided any authority to the court in support of that argument, which they appear to have abandoned.

pay within the meaning of § 2530.200b-2(a)(3).  Taking plaintiffs' allegations as true, the court cannot infer otherwise.

In reaching this conclusion, the court finds the alleged conflict of interest under which plaintiffs contend the Board of Trustees operated to be of little significance.  First, the Plan is a multi-employer plan; therefore, those trustees appointed by participating employers were not appointed solely by Nabisco.  Second, the participating employers appoint only ten of the trustees.  The union appoints the other ten, further mitigating any effect of the alleged conflict.

Reliance on the § 1.25 and § 2530.200b-2(a)(3) definitions alone, however, cannot end the inquiry as to whether, under ERISA, the plan owes pension benefits to plaintiffs for periods of layoff in and after 1976 because § 2530.200b-2(a) provides *three* definitions of an hour of service.  Plaintiffs' failure to state a claim under § 2530.200b-2(a)(3) does not necessarily mean plaintiffs have failed to state a claim under an alternative definition from § 2530.200b-2(a).  No party disputes that the Plan falls within the regulatory framework of ERISA, and ERISA and its accompanying regulations serve as a floor—a regulatory minimum—with respect to the rights of participants.  29 U.S.C. § 1003 (defining scope of ERISA's coverage); 29 C.F.R. § 2530.200a-1(a) (stating that ERISA "contains minimum standards that a plan which is an employee pension benefit plan within the meaning of section 3(2) of [ERISA] and which is covered under Part 2 must satisfy" and that the "standards contained in [ERISA] are 'minimum' standards").  Moreover, ERISA plans that use the hours of service metric must follow, at minimum, the regulatory definitions of an hour of service.  § 2530.200b-2(a) (stating that the definitions of an hour of service provided therein "must, as a minimum, be counted"); § 2530.200b-2(f) ("A plan which credits service on the basis of hours of service must state in the plan document the definition of hours of service set forth in paragraph (a) of this section.").

In reaching its decision explained in the Plan Denial, the Appeals Committee apparently ignored the definition of an hour of service from § 2530.200b-2(a)(2), which the court reproduced in full, above.  Plaintiffs quoted and cited subsection § 2530.200b-2(a)(2) as a basis for their entitlement to pension credit in their administrative appeal, in the amended complaint, and in their response to defendants' motion to dismiss.  (*See, e.g.*, Defs.' Mot. Dismiss (Doc. No. 10) Ex. D at 3, 10; Am. Compl. ¶¶ 38, 48-49, 64; Pls.' Mem. Law Opp'n Defs.' Mot. Dismiss (Doc. No. 25) at 12-13, 27, 29.)  However, defendants failed to address that subsection.  The Plan Denial did not address subsection (a)(2), nor did defendants' memorandum in support of their motion to dismiss or defendants' reply memorandum.  Faced with this dearth of briefing on the issue at this early stage of the litigation, the court will deny defendants' motion as to plaintiffs' entitlement to pension credit, under subsection (a)(2), for periods of layoff in and after 1976.  Therefore, the court will deny defendants' motion as to plaintiffs' claims for pension credit for periods of layoff in and after 1976.

## IV.    Conclusion

Plaintiffs have failed to state a claim that the Appeals Committee or the Board of Trustees committed an abuse of discretion in issuing the Plan Denial as to benefits sought for periods of layoff before 1976.  The court will, therefore, grant defendants' motion as to plaintiffs' pre-1976 pension claims.  Plaintiffs, however, have met their procedural burden as to pension benefits sought for periods of layoff in and after 1976.  Accordingly, the court will deny defendants' motion as to plaintiffs' pension claims regarding this later period.