# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| PHYLLIS ANDERSON, *et. al.*, | : | |
|     Plaintiffs, | : | CIVIL ACTION |
| | : | |
|     v. | : | NO. 07-1165 |
| | : | |
| THE BAKERY AND CONFECTIONERY UNION | : | |
| AND INDUSTRY INTERNATIONAL PENSION | : | |
| FUND, *et. al.*, | : | |
|     Defendants. | : | |
| | : | |

**Memorandum**

YOHN, J.                                                                                              July 14, 2010

Plaintiffs, eighteen women who are current or former employees of Nabisco, Inc., bring

this action on behalf of themselves and a class of similarly situated women pursuant to the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, against the

Bakery and Confectionery Union and Industry International Pension Fund (the "Plan"); the Board

of Trustees of the Bakery and Confectionery Union and Industry International Pension Fund

("Board of Trustees" or "Board"); and the Appeals Committee of the Board of Trustees

("Appeals Committee"). Plaintiffs seek pension credit for periods of layoff between 1976 and

1981.[1]

Plaintiffs have moved for partial summary judgment and defendants have moved for

judgment on the pleadings. At issue in both motions is the application of 29 C.F.R. § 2530.200b-

2(a)(2), which requires that employees receive pension credits for "hours for which an employee

is paid, or entitled to payment, by the employer on account of a period of time during which no

---

[1] Plaintiffs have not yet filed a motion to certify the proposed class.

duties are performed . . . due to . . . layoff . . . ." Plaintiffs argue that, under the terms of a 1982 settlement of a sex discrimination class action, plaintiffs received payments on account of periods of layoff between 1976 and 1981 and are therefore entitled under (a)(2) to pension credit for those periods. Defendants counter that plaintiffs' payments under that settlement were not covered by (a)(2) because the settlement distribution formula did not distinguish between periods of layoff, periods of absence for other reasons, and periods of actual work; as a result, the payments did not compensate plaintiffs for periods of absence due to layoff but rather for overall longevity in employment.

Upon administrative review of plaintiffs' claims for additional pension credits, the Appeals Committee found that the class action settlement distributions were calculated based on the class members' overall longevity in their positions, not on the amount of their lost income due to layoff. As a matter of law, that factual finding cannot be set aside absent a showing it resulted from an abuse of discretion, and plaintiffs have not stated a plausible claim that the Appeals Committee's finding constituted such an abuse of discretion. Interpreting (a)(2) *de novo* and applying it to the Appeals Committee's factual finding, I conclude that plaintiffs have not stated a plausible claim that they are entitled to pension benefits for the periods in question and I will grant defendants' motion for judgment on the pleadings. Having granted judgment on the pleadings in favor of defendants, I will deny plaintiffs' motion for partial summary judgment.

# I. Factual and Procedural Background[2]

Plaintiffs are current or former employees at Nabisco's Philadelphia bakery, all of whom began work at Nabisco in the 1960s or 1970s. The Plan is a multi-employer defined benefit plan of which plaintiffs are beneficiaries. The Board of Trustees, which serves as the Plan Administrator, consists of ten members appointed by the employers that participate in the Plan and ten members appointed by the union. The Appeals Committee consisted of Frank Hurt, Chairman of the Board of Trustees, and Dick Cook, Secretary of the Board of Trustees. Hurt was a union appointee and Cook was an employer appointee.

The history of plaintiffs' claims is as follows.

## A. The *Karan* Action

Plaintiffs, along with many other female Nabisco employees, shared in the settlement of a sex discrimination class action against Nabisco, which was approved in 1982. *See Karan v. Nabisco, Inc.*, Nos. 75-1356 & 77-927 (W.D. Pa., settlement approved Jan. 28, 1982). The *Karan* action involved more than seventeen allegations of employment discrimination, including an allegation of discriminatory layoff practices. Other allegations included pay discrimination, harassment, and failure to promote to higher-paying, supervisory positions.

Pursuant to the *Karan* settlement agreement, Nabisco set aside a $4.9 million settlement fund to be distributed among the class members as follows: after paying the *Karan* plaintiffs' attorneys' fees, expenses, and costs and after making payments to the named *Karan* plaintiffs and class members who had filed charges then pending before the EEOC, the balance of the

---

[2] All material facts are undisputed as between the parties. I view the facts in the light most favorable to plaintiffs for the purposes of defendants' motion for judgment on the pleadings and in the light most favorable to defendants for the purposes of plaintiffs' motion for partial summary judgment.

settlement fund was allocated to the remaining *Karan* class members who submitted claims based on "distribution units." Eligible claimants received, for each month of employment, a set number of distribution units that varied according to job classification and whether the month of employment occurred before December 31, 1975.[3] Moreover, an eligible claimant who experienced a period of absence received distribution units for each month of absence "as though the person were still in the last classification (prior to the absence) recorded [in Nabisco's employment history records for that person]." (*Karan* Settlement Agreement ¶ 9(d).) "In other words," the *Karan* settlement agreement stated, claimants received "payments regarding periods of layoff, disability, pregnancy, and other absences." (*Id.*)

The monetary distribution paid to each eligible claimant was then calculated by dividing each claimant's number of distribution units by the total number of distribution units awarded overall, then multiplying that number by the amount of money remaining in the settlement fund after payment of the priority claims described above. (*Id.* ¶ 9(d)). Each of the plaintiffs in this action received a sum between $359.11 and $1,543.89; nine of the eighteen plaintiffs received $518.72. (*See* Pls.' Mot. Summ. J. (Doc. #45) Ex. B.)[4]

---

[3] Each claimant received between one and five distribution units for each month of employment after January 1, 1976, and received twice as many distribution units for each month of employment between November 17, 1971, and December 31, 1975. (Defs.' Mot. Dismiss (Doc. #10) Ex. C. ("*Karan* Settlement Agreement") ¶ 9(d).)

[4] By way of context, I note that the plaintiffs who received $518.72 each had 169 distribution units. Each distribution unit was therefore ultimately worth approximately $3.07. (Pls.' Mot. Summ. J. Ex. B.) Because employees received distribution units for months of layoff as if they had continued to be employed in their last previous job classification, the distributions plaintiffs received for each month of layoff after 1976 varied between approximately $6 and $30. *See supra* note 3 (discussing the number of distribution units awarded per month of employment). Even after adjusting for inflation since 1981, that sum is roughly equivalent to payments of $15 to $72 per month, or $0.09 to $0.60 per hour assuming that plaintiffs averaged 40 hours of work per week. *See* Bureau of Labor Statistics, *Consumer Price Index Inflation Calculator*, at http://data.bls.gov/cgi-bin/cpicalc.pl.

The *Karan* settlement agreement also stated that:

The monetary payments to which an Eligible Claimant is entitled upon application of the formula will not be included by [Nabisco] in any compensation base for computing employment benefits available to any Eligible Claimant.

(*Karan* Settlement Agreement ¶ 9(f).)

In addition to distribution of the settlement fund, the *Karan* settlement agreement set forth numerous remedial measures related to the *Karan* plaintiffs' allegations of discrimination.

## B.    The *Wilson* Action

In 2001 the plaintiffs in the present action initiated a lawsuit against the Board of Trustees, Nabisco, and Phillip Morris, Inc. (which had become Nabisco's corporate parent), seeking pension credit for the periods of layoff covered by the *Karan* settlement agreement. Plaintiffs argued that they were entitled to pension credit pursuant to ERISA regulations requiring that employers count as "hours of service," for the purposes of benefit computation, any periods of layoff on account of which the employee is "paid, or entitled to payment, by the employer," *see* 29 C.F.R. § 2530.200b-2(a)(2), or for which back pay is "awarded or agreed to by the employer," *see id.* § 2530.200b-2(a)(3).[5]

The district court granted Nabisco's motion to dismiss and entered judgment in favor of all defendants. *Wilson v. Nabisco*, No. 01-415, 2002 WL 32351159 (E.D. Pa. April 2, 2002). The court based its decision on its determinations that (1) the *Karan* settlement distributions did not constitute "back pay" within the meaning of (a)(3) and (2) the release in the *Karan* settlement

---

[5] Hours of service is a metric by which ERISA, through applicable federal regulations, mandates pension credit be calculated. *See* 29 U.S.C. § 1052(a)(3)(C) (delegating definition of an hour of service to the Secretary of Labor); 29 C.F.R. § 2530.200b-2(a) (defining "hour of service").

agreement served to bar plaintiffs' claims. *Id.* at *6-*10.[6] In support of the latter conclusion, the

district court noted that most plaintiffs had received $518.72 pursuant to the *Karan* settlement

agreement, whereas "the median total pension benefit sought in this action is 120 times that sum,

or $63,150," which suggested that Nabisco had not foreseen that the settlement distributions

would give rise to such a massive entitlement to benefits. *Id.* at *7 n.6. The district court did not

address whether the distributions constituted payment on account of periods of layoff within the

meaning of (a)(2).

 The Third Circuit vacated the district court's decision on December 8, 2003, finding that

plaintiffs had not exhausted their administrative remedies by applying to the Plan for benefits

prior to filing suit, as required by ERISA. *Wilson v. Nabisco*, 82 F. App'x 282, 284 (3d Cir.

2003); 29 U.S.C. § 1132(a)(1)(B). Because, "at oral argument, the Plan's counsel agreed that the

Plan would nonetheless hear and consider the women's claim for pension benefits," the Third

Circuit remanded the matter to the district court "with directions to dismiss the complaint

without prejudice to the right of the plan participants to present their claims for pension credits to

the Plan in the first instance." *Id.* at 284.

### C.   Administrative Exhaustion

 Plaintiffs submitted an application for additional pension credit to the Plan on April 30,

2004. In their initial application, plaintiffs relied on both 29 C.F.R. § 2530.200b-2(a)(2), which

governs periods of layoff for which employees are paid or entitled to payment, and (a)(3), which

governs periods for which back pay is awarded or agreed to by the employer. The Plan denied

plaintiffs' application on June 16, 2004 (the "Initial Denial"). The Initial Denial letter stated that

---

[6] The present defendants do not contend in their motion for judgment on the pleadings, or
in opposition to plaintiffs' motion for summary judgment, that the release in the *Karan*
Settlement Agreement with Nabisco bars plaintiffs' claims here.

the *Karan* settlement agreement was "intended to settle claims of discrimination by the company, not to provide back pay for periods of layoff [within the meaning of (a)(3)], or otherwise pay plaintiffs on account of time not worked [within the meaning of (a)(2)]." (Pls.' Opp'n Defs.' Mot. Dismiss (Doc. #25) Ex. C ("Initial Denial Letter").) Instead, the payments were intended to settle "more than a dozen discrete claims of sexual discrimination in employment," most of which were unrelated to discriminatory layoff. (*Id.*)

Plaintiffs appealed the Initial Denial through the Plan's internal appeal process on December 22, 2004. Although the parties are in disagreement as to the extent to which plaintiffs relied on (a)(2) in their appeal, the record reveals that plaintiffs cited both (a)(2) and (a)(3) in their appeal but did not include any argument with reference to (a)(2). Their argument focused on whether the *Karan* settlement distributions constituted "back pay" pursuant to (a)(3).

On March 22, 2005, the Appeals Committee, which reviewed plaintiffs' application on behalf of the Board of Trustees, issued a final denial (the "Plan Denial") of plaintiffs' claims.[7] (*See* Pls.' Opp'n Defs.' Mot. Dismiss Ex. E ("Plan Denial").) The Appeals Committee's reasoning largely echoed that in the Initial Denial but, unlike the Initial Denial, referred exclusively to 29 C.F.R. § 2530.200b-2(a)(3) and the Plan's own definition of an "hour of service," which was based on (a)(3).[8] The Appeals Committee found that the *Karan* settlement

---

[7] The Board of Trustees serves as the plan administrator under ERISA. The Appeals Committee is a subcommittee composed of two Trustees. According to the Plan Rules and Regulations, the Board of Trustees may delegate administrative decisionmaking powers to its subcommittees. (Defs.' Mot. Dismiss Ex. B ("Plan Rules & Regulations") § 8.04.)

The parties assume in their briefs, and I therefore assume for the purposes of this opinion, that the Appeals Committee acted on behalf of the Board. I will therefore refer to these entities interchangeably for the balance of this opinion.

[8] The Plan Rules and Regulations contain no provision analogous to (a)(2). (*See* Plan Rules & Regulations § 1.25.)

distributions were not "'intended to compensate [plaintiffs] for periods during which [they] would have been engaged in the performance of duties for [Nabisco],'" as required by the Plan's definition of "back pay." (Plan Denial 2 (quoting Plan Rules & Regulations § 1.25).) Nor were the payments "back pay <u>for</u> periods of layoff" within the definition of (a)(3) itself. (*Id.* at 3.) Rather, the Appeals Committee concluded that the language in the *Karan* Settlement Agreement that "persons will receive payments regarding periods of layoff" did "not establish that payments were made as back pay <u>for</u> those periods, only that those periods were included in measuring the longevity in specific job classifications that was the determining factor in the distribution." (*Id.*) The Appeals Committee noted, for example, that the distribution formula also awarded distribution units for other types of leave, such as sick leave, at the same rates as for periods of layoff, and that the formula did not distinguish between periods of discriminatory layoff (for which the settlement could be intended to compensate) and nondiscriminatory layoff (for which the settlement could not have been intended to compensate). (*Id.*)

### D. The Present Action

Having exhausted their administrative remedies within the Plan, plaintiffs filed the instant action seeking an award of pension benefits and attorneys' fees.

Plaintiffs initially argued that they were entitled to pension credits pursuant to either 29 C.F.R. § 2530.200b-2(a)(2) or (a)(3). On defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), I dismissed plaintiffs' claims to the extent that they relied on (a)(3). *See Anderson v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 654 F. Supp. 2d 267, 283 (E.D. Pa. 2009). I concluded that, because the terms of the Plan granted discretion to the Board to interpret and apply the terms of the Plan, the Board's decision to deny pension benefits was entitled to deference and would be overturned only if it was an abuse of discretion. *Id.* at

279. I further concluded that plaintiffs had failed to state a plausible claim that the Board acted arbitrarily or capriciously in concluding that plaintiffs were not entitled to hours of service under either the terms of the Plan or § 2530.200b-2(a)(3). I concluded that (a)(3), which mandates pension credit for periods for which the employer has agreed to back pay, only applied to situations in which the employer intended that the payments constitute "back pay" for periods during which no work was performed. 564 F. Supp. 2d at 283. In light of the numerous aspects of the *Karan* settlement agreement suggesting that the payments "were not based exclusively or even predominantly on periods of layoff" and were not intended to give rise to any additional rights to pension benefits, I concluded that plaintiffs had not raised a plausible inference that the Board of Trustees abused its discretion in finding that those distributions were not intended to be "back pay" for periods of layoff. *Id.*[9]

Although I concluded that plaintiffs had not stated a claim under (a)(3), I denied defendants' motion to dismiss as to plaintiffs' claim of entitlement to pension benefits under (a)(2) because defendants had failed to address that subsection in their motion to dismiss or in their reply memorandum.[10] *Id.* at 284.

---

[9] I also denied plaintiffs' claims to the extent that they arose out of layoffs prior to 1976. I concluded that plaintiffs had not stated a plausible claim that the Board of Trustees had abused its discretion in denying those claims. As the Plan Denial stated, for pre-1976 periods, pension credit under the Plan was "awarded 'on the basis of [a Participant's] days of work in Covered Employment during a Calendar Year on which contributions to the Pension Fund were made,'" and "Nabisco made no contributions to the Pension Fund for the periods of layoff at issue." (Plan Denial 1.) *See Anderson*, 654 F. Supp. 2d at 280.

[10] In their motion for partial summary judgment, plaintiffs now state that, in denying in part defendants' motion to dismiss, I "held that Plaintiffs had stated a claim for additional pension credits" under (a)(2). (Pls.' Mot. Summ. J. 1.) In fact, I had declined to decide whether plaintiffs had stated a valid claim under (a)(2) due to a "dearth of briefing on the issue at this early stage of litigation." *Anderson*, 654 F. Supp. 2d at 284.

On January 29, 2010, plaintiffs filed the instant motion for partial summary judgment as to their eligibility for benefits under (a)(2) and defendants filed their motion for judgment on the pleadings as to the same issue. Both parties have submitted responses to each other's motions and replies to those responses.

**II. Discussion**

Defendants' motion for judgment on the pleadings and plaintiffs' motion for summary judgment both focus on two key issues: (1) the extent to which I should defer to the findings of the Board of Trustees, and (2) whether the reference to payments "on account of" periods of layoff in 29 C.F.R. § 2530.200b-2(a)(2) covers only payments intended to compensate for those periods of layoff.

Applying the standard of review appropriate for motions for judgment on the pleadings, I conclude as a matter of law that the Board's findings of fact, but not its interpretation of (a)(2) itself, are entitled to deference. The Board found that the *Karan* settlement agreement accounted for periods of layoff as part of a plan to distribute funds according to overall length of service and did not treat periods of layoff differently from periods for which plaintiffs had already received some wages. Plaintiffs have not stated a plausible claim that this finding of fact was an abuse of discretion. I must therefore defer to the Board's finding, which necessarily implies that the settlement distributions did not compensate for lost wages but for longevity in a job classification. I then review (a)(2) *de novo* and conclude as a matter of law that the definition of "hour of service" in (a)(2) encompasses only payments that compensate for lost wages during periods of layoff or other absence and not payments that merely happen to include periods of layoff within the calculation. Applying my interpretation of (a)(2) to the Board's factual finding, I conclude as a matter of law that the plaintiffs have not stated a plausible claim that they

received payments on account of periods of layoff within the meaning of (a)(2). As a result, I will grant defendants' motion for judgment on the pleadings.

Having granted defendants' motion for judgment on the pleadings, I will deny plaintiffs' motion for partial summary judgment.

## A. Judgment on the Pleadings

Rule 12(c) permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). Where, as here, a Rule 12(c) motion challenges the plaintiff's failure to state a claim upon which relief can be granted, the court evaluates the motion under the same standard as a motion to dismiss pursuant to Rule 12(b)(6). *Foreman v. Lowe*, 261 F. App'x 401, 403 n.1 (3d Cir. 2008); *Turbe v. Gov't of V.I.*, 938 F.2d 427, 428 (3d Cir. 1991).

"To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Factual allegations "that are 'merely consistent with' a defendant's liability," or that permit the court to infer no more than "the mere possibility of misconduct," are not enough. *Id.* at 1949-50 (quoting *Twombly*, 550 U.S. at 557). Rather, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* at 1949. In evaluating a motion to dismiss, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009); *see also Iqbal*, 129 S. Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

**1. Deference to the Board of Trustees**

In my dismissal of plaintiffs' claims arising under 29 C.F.R. § 2530.200b-2(a)(3) and under the terms of the Plan, I reviewed the Plan Denial under the deferential abuse of discretion standard. *Anderson*, 654 F. Supp. 2d at 279. Plaintiffs argue that, notwithstanding my previous decision, I should review the Plan Denial *de novo* with respect to plaintiffs' claims arising under § 2530.200b-2(a)(2). Plaintiffs argue that, because the Plan's definition of an "hour of service" failed to include the definition found in (a)(2) and because the Plan Denial did not mention or apply (a)(2), "[t]here is nothing to 'defer' to" with respect to plaintiffs' entitlement to benefits under (a)(2). (Pls.' Mot. Summ. J. 3.) Plaintiffs further argue that deference is unwarranted because their (a)(2) claim arises under ERISA regulations, not the terms of the Plan, and "application of ERISA and its regulations is a question of law for the Court to perform *de novo*." (*Id.*) I conclude as a matter of law that the Board's factual findings with respect to the intent behind the *Karan* settlement agreement are entitled to deference to the extent that they are relevant under (a)(2) and are not an abuse of discretion, even though the Board made those findings in the context of applying (a)(3). I agree with plaintiffs, however, that the interpretation of (a)(2) is a question of law to be decided *de novo*.

As I noted in my dismissal of plaintiffs' other claims, the Plan grants the Board of Trustees "'full discretionary authority to determine all questions arising in the administration, interpretation and application of the plan,'" including the authority to interpret the terms of the *Karan* settlement agreement. *Anderson*, 654 F. Supp. 2d at 279 (quoting *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 438 (3d Cir. 1997)). Where the terms of a plan give the administrator or fiduciary discretionary authority to make factual determinations in the course of determining

eligibility for benefits, the administrator's decision is entitled to deference and may not be set aside unless it constitutes an abuse of discretion. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2348 (2008); *Gibson v. Hartford Life And Accident Ins. Co.*, No. 206-CV-3814-LDD, 2007 WL 1892486, at *5 n.4 (E.D. Pa. June 29, 2007) (citing *Mitchell*, 113 F.3d at 438, and holding that, where plan administrator has authority to "determine eligibility for benefits," factual determinations, as well as interpretive determinations, are within the scope of [the plan administrator's] discretion"). I therefore concluded that the Appeals Committee's findings that the *Karan* settlement distributions were not "'intended to compensate [plaintiffs] for periods during which [they] would have been engaged in the performance of duties for [Nabisco],'" but rather that periods of layoff "were included in measuring the longevity in specific job classifications that was the determining factor in the distribution," were entitled to deference. (Plan Denial 2-3 (quoting Plan Rules & Regulations § 1.25).)

Plaintiffs argue that the Appeals Committee only had the authority to interpret or apply provisions of the Plan and that, as a result, their interpretation of the *Karan* settlement agreement—which is not a Plan document—can be entitled to deference only insofar as it is necessary to determine plaintiffs' eligibility for benefits under the *Plan's* definition of "hours of service." Because neither the *Karan* settlement agreement nor (a)(2) is a part of the Plan itself—the Plan's definition of "hours of service" did not include the definition found in (a)(2)—plaintiffs argue that the Appeals Committee had no discretionary authority to make factual determinations in the course of deciding whether the *Karan* settlement agreement gave rise to any right to hours of service under (a)(2).

The Plan's grant of authority to the Board was not limited, however, to factual determinations necessary to apply the terms of the Plan itself as opposed to determinations in the course of applying regulations supplementing the Plan's terms. The Plan grants to the Board the "sole and absolute discretionary authority" to, *inter alia*, "take all actions and make all decisions with respect to *eligibility for, and the amount of, benefits payable under the Plan*" and to "decide questions, including legal or factual questions, *relating to the calculation and payment of benefits under the Plan*." (Plan Rules & Regulations § 8.04 (emphasis added).) As I noted in my previous opinion in this case, such a grant of authority grants the Board the discretion to "decide all matters arising in connection with the operation or administration of the Plan." *Anderson*, 654 F. Supp. 2d at 279. In the course of administering the Plan, the Board is required, "at a minimum," to follow the definition of "hours of service" set forth in § 2530.200b-2(a). *See* 29 C.F.R. § 2530.200b-2(a). The extent to which (a)(2) applies to periods of layoff that were included in calculating the *Karan* settlement distributions is therefore a matter "arising in connection with the operation or administration of the Plan." Although the Appeals Committee lacked the authority to interpret the meaning of (a)(2) *itself*,[11] *see Samaroo v. Samaroo*, 193 F.3d 185, 189 (3d Cir. 1999), it did have the authority to make factual determinations in the course of applying (a)(2). *Cf. Mitchell*, 113 F.3d at 439 ("'[A]pplication' of the Plan, *like 'application' of the law*, must encompass the resolution of factual disputes as well as the interpretation of the governing provisions of the plan." (emphasis added)).

---

[11] Although defendants argue that the proper interpretation of (a)(2) is not at issue, I note that the parties sharply disagree as to the meaning of (a)(2). Defendants argue that employees are entitled to payment "on account of" periods of layoff only when the payment is made for the purposes of compensating those employees for the periods of layoff. Plaintiffs counter that employees are entitled to payment "on account of" periods of layoff whenever the fact that the employee has experienced a layoff gives rise to an entitlement to payment, regardless of the purpose underlying the payment. I address this disagreement in further detail *infra* at Part III.D.

Plaintiffs further argue that, even if the Board had the authority to make factual

determinations in the course of applying (a)(2), the findings that the Board actually made are not

entitled to deference because the Appeals Committee never explicitly addressed (a)(2) in the Plan

Denial. Where the administrator fails to use his or her discretion, his or her decision is reviewed

*de novo. See Gritzer v. CBS, Inc.*, 275 F.3d 291, 296 (3d Cir. 2002) (holding that, where the

administrator "apparently never made any effort to analyze [plaintiffs'] claims much less to

advise them of what the analysis disclosed until after this litigation was filed," there was "simply

. . . no analysis or 'reasoning' to which the Court may defer under the arbitrary and capricious

standard" (internal quotations and citation omitted)). Unlike the administrator in *Gritzer*,

however, the Appeals Committee in this case conducted a detailed analysis of the provisions in

the *Karan* settlement agreement and the intent underlying that agreement. It cannot therefore be

said that the Appeals Committee "never made any effort to analyze" plaintiffs' claims or that

there is "no analysis or 'reasoning' to which the Court may defer." *Id.* I see no reason not to

afford the Appeals Committee's findings of fact deference to the extent that they are also relevant

under (a)(2).[12]

---

[12] Plaintiffs further note that the Plan's rules and regulations were required by law to
include a definition of "hour of service" as set forth in (a)(2). *See* 29 C.F.R. § 2530.200b-2(f).
Plaintiffs argue that, because the definition in (a)(2) was omitted from the rules and regulations,
the Plan "violated ERISA's substantive (not merely procedural) requirements." (Pls.' Opp'n
Defs.' Mot. J. Pleadings ("Pls.' Opp'n") 2.) Plaintiffs do not argue that, as a result of the Plan's
failure to abide by § 2530.200b-2(f), they were not on notice of the definition of "hour of
service" found in (a)(2). They instead argue that the Plan's failure to include the appropriate
definition of "hour of service" in its rules and regulations caused the Appeals Committee to fail
to address (a)(2) in the Plan Denial. Plaintiffs' argument is undermined by the fact that the Board
did explicitly apply (a)(2) in the Initial Denial even though it was applying the same rules and
regulations that the Appeals Committee applied for the purposes of the Plan Denial. (*See* Initial
Denial Letter 2.) Even if the omission of (a)(2) from the rules and regulations is the cause for the
Appeals Committee's failure to address (a)(2), plaintiffs have not explained how that fact would
be relevant to the amount of deference due to the Appeals Committee's interpretation of the
*Karan* agreement, to the extent that this interpretation is relevant to plaintiffs' entitlements under

Furthermore, as plaintiffs' arguments in their initial application for benefits and administrative appeal reveal, plaintiffs were on notice throughout the administrative process that the characterization of the *Karan* settlement agreement was disputed and that such characterization could be relevant to plaintiffs' entitlement to pension credits under (a)(2) as well as under the Plan provisions and (a)(3). As a result, they cannot reasonably argue that they lacked sufficient "information to prepare adequately for further administrative review or an appeal to the federal courts." *See Skretvedt v. E.I. DuPont de Nemours & Co.*, 268 F.3d 167, 178 n.8 (3d Cir. 2001) (quoting *DuMond v. Centex Corp.*, 172 F.3d 618, 622 (8th Cir. 1999)) (suggesting that a plan administrator's factual findings may not be entitled to deference if the plan administrator fails to discuss those findings adequately in the letter denying plaintiff's administrative claims).

I therefore conclude that the Board's factual interpretation of the *Karan* settlement agreement is entitled to deference to the extent that it is relevant to plaintiffs' entitlement to pension credits under (a)(2).

### 2. Waiver

Plaintiffs further argue that defendants have waived their right to contest plaintiffs' entitlement to credit under 29 C.F.R. § 2530.200b-2(a)(2) by virtue of the Board's failure to discuss (a)(2) in the Plan Denial. (*See* Pls.' Opp'n Defs.' Mot. J. Pleadings (Doc. #52) 5 ("Pls.' Opp'n") (arguing that, because the Trustees "ignored § 2530.200b-2(a)(2)" in the Plan Denial, the defendants' arguments regarding the application of (a)(2) in this case should be "disregarded.").) None of the authorities that plaintiffs cite, however, supports such an argument.

"[W]hen a claim has been denied internally, the trustee must provide written notice 'setting forth the specific reasons for such denial.'" *Taylor v. Cont'l Group*, 933 F.2d 1227, 1235

---

(a)(2).

(3d Cir. 1991) (quoting 29 U.S.C. § 1133(1)). The Third Circuit has noted that it would be "problematic to, on one hand, recognize an administrator's discretion to interpret a plan by applying a deferential 'arbitrary and capricious' standard of review, yet, on the other hand, allow the administrator to 'shore up' a decision after-the-fact by testifying to the 'true' basis for the decision after the matter is in litigation," as such an approach may "invite more terse and conclusory decisions from plan administrators" and allow them to "brainstorm and invent various proposed 'rational bases' when their decisions are challenged in ensuing litigation." *Skretvedt*, 268 F.3d at 178. Some cases following *Skretvedt* have declined to consider arguments advanced by the plan administrator only after litigation had commenced, even under a *de novo* standard. *See, e.g.*, *Doyle v. Nationwide Ins. Cos. & Affiliates Employee Health Care Plan*, 240 F. Supp. 2d 328, 347 (E.D. Pa. 2003); *Nair v. Pfizer*, No. 07-5203, 2009 WL 1635380, at *9-11 (D.N.J. June 10, 2009).

At issue in *Skretvedt*, *Doyle*, and *Nair* were the defendants' attempts during litigation to raise, in support of their denial of the plaintiffs' claims, arguments that the plaintiffs could not have foreseen prior to the start of litigation. All three courts were primarily concerned with prejudice resulting from the plaintiffs' inability to anticipate those *post hoc* arguments in order to rebut them in their administrative appeals. Here, in contrast, plaintiffs were clearly aware that the application of (a)(2) was at issue at all stages of the administrative process as it was one of the bases on which they sought pension credits. Moreover, unlike in *Skretvedt*, *Doyle*, and *Nair*, here the Initial Denial, at least, did explicitly address the application of (a)(2) to plaintiffs' claims and denied plaintiffs' claims under (a)(2) for substantially the same reasons that defendants now cite in support of their motion for judgment on the pleadings. Finally, although plaintiffs cited to (a)(2) in their brief on appeal of the Initial Denial, their entire argument was based on (a)(3). The

Plan Administrator's response to an application for benefits "sufficiently complie[s] with the requirement that it provide written notice of the reasons for its denial" the response is "directed toward what appear[s] to be the sole thrust of [the claimant's] arguments before it." *Taylor*, 933 F.3d at 1236.

Even if the Plan Denial were deficient in its failure to address the application of (a)(2), "[t]he remedy when a court or agency fails to make adequate findings or to explain its ground adequately is to send the case back to the tribunal for further findings or explanation." *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996); *see also Schreibeis v. Ret. Plan for Employees of Duquesne Light Co.*, No. 04-969, 2005 WL 3447919, at *9 (W.D. Pa. Dec. 15, 2005) (when plan failed to give sufficient explanation of denial of benefits, remand, not award of benefits, was appropriate). Plaintiffs have not requested remand as an alternative to dismissal or to judgment on the pleadings. Nor do I consider such a remand warranted. The Plan Denial resolved all relevant facts and plaintiffs had adequate incentive and opportunity to challenge those factual findings in both their initial application and appeal; all that remains is application of (a)(2)—which I interpret *de novo*—to those facts.[13]

### 3. The Board's Interpretation of the *Karan* Settlement Agreement

In its final letter denying plaintiffs' administrative claims, the Board of Trustees found that the distributions from the *Karan* settlement fund were not "'intended to compensate [plaintiffs] for periods during which [they] would have been engaged in the performance of duties for [Nabisco].'" (Plan Denial 2 (quoting Plan Rules and Regulations § 1.25).) The Board supported that conclusion by noting that "[d]iscriminatory layoff was listed only 13th out of 17

---

[13]I am also influenced in rejecting the possibility of remand by the fact that this litigation has been ongoing since the *Wilson* complaint was filed in January 2001.

alleged discriminatory practices" and that the "formula for distribution of the settlement fund was explicitly designed to compensate class members for their claims of discrimination in job classifications, promotion, and pay." (*Id.*) "The formula thus compensated for longevity in each classification," with periods of layoff included "along with all 'other types of absence,' whether alleged to be discriminatory or not (for example, periods of absence due to pregnancy or disability)." (*Id.* at 4 (quoting *Karan* Settlement Agreement ¶ 9(d)(v).)

"Under the arbitrary and capricious (or abuse of discretion) standard of review, the district court may overturn a decision of the Plan administrator only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (quoting *Adamo v. Anchor Hocking Corp.*, 720 F. Supp. 491, 500 (W.D. Pa. 1989)). "This scope of review is narrow, and the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Id.* (internal quotation omitted).

In my memorandum dismissing plaintiffs' claims arising under (a)(3) and the Plan provisions, I concluded that plaintiffs had failed to state a plausible claim that the Appeals Committee had abused its discretion in finding that the *Karan* settlement agreement was not designed to compensate for periods of layoff. *Anderson*, 654 F. Supp. 2d at 283. Although plaintiffs continue to object to that finding (*see* Pls.' Opp'n 15 n.13), they have not advanced any new evidence or arguments in furtherance of their argument. As a result, I will not disturb my previous conclusion.

### 4. Scope of § 2530.200b-2(a)(2)

Plaintiffs argue that, even if the Board of Trustees reasonably concluded that the *Karan* settlement distributions attributable to periods of layoff were not intended to compensate for

19

those periods, that finding is not dispositive of their claims. Plaintiffs argue that, in order to qualify for credit under (a)(2), they need only show that the settlement distribution formula allocated distribution units for months of layoff and that part of the settlement proceeds that they received is attributable to those distribution units. As noted above, I interpret the meaning of (a)(2) *de novo*. I conclude that (a)(2) was intended to encompass only periods of paid leave during which employees receive payments that replace, in whole or in part, the compensation that they would have earned had they been working.

Congress has delegated the task of defining an "hour of service" for the purposes of benefit accrual to the Secretary of Labor. *See* 26 U.S.C. § 410(a)(3)(C). Pursuant to its delegated authority, the Secretary issued a regulation defining an "hour of service" as follows:

> (1) An hour of service is each hour for which an employee is paid, or entitled to payment, for the performance of duties for the employer during the applicable computation period.

> (2) An hour of service is each hour for which an employee is paid, or entitled to payment, by the employer on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence. . . .

> (3) An hour of service is each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by the employer. The same hours of service shall not be credited both under paragraph (a)(1) or paragraph (a)(2), as the case may be, and under this paragraph (a)(3). Thus, for example, an employee who receives a back pay award following a determination that he or she was paid at an unlawful rate for hours of service previously credited will not be entitled to additional credit for the same hours of service. . . .

29 C.F.R. § 2530.200b-2(a).[14]

_____

[14] The omitted portions of the regulation are miscellaneous provisions that: (1) place a 501-hour cap on hours of service attributable to any one period qualifying under (a)(2) or (a)(3); (2) exclude from the scope of (a)(2) payments due under a plan maintained "solely for the purpose of complying with applicable workmen's compensation, or unemployment compensation or disability insurance laws"; (3) exclude from the scope of (a)(2) payments which "solely

Unfortunately, few cases have addressed the scope of (a)(2). In *Mora v. Construction Laborers Pension Trust for So. Cal.*, 435 F.3d 1121, 1123-24 (9th Cir. 2006), employers that hired laborers from a construction union made payments on each laborer's behalf to a multi-employer "vacation trust" for each hour that the laborer worked. These contributions were intended to replace paid vacation and the applicable collective bargaining agreement considered them to be part of the hourly wages of the worker on whose behalf they were made. Taxes were withheld at the time that an employer made a contribution to the trust, not when a worker actually took a vacation. *Diamond v. Treasurers and Ticket Sellers Union Local 751 Pension Fund*, No. 05 Civ.1937, 2006 WL 2462907, at *9 (S.D.N.Y. Aug. 22, 2006), concerned a similar scheme pursuant to which a theater concessions worker received a premium on top of his hourly wage intended to replace a paid vacation. The *Mora* and *Diamond* courts both held that the payments were not "on account of" hours not worked due to vacation but rather a part of the wages that the plaintiffs earned for hours actually worked. Because plaintiffs had already received pension credits for those worked hours, the courts held that it would be "double-counting" to award additional credits simply because part of the wages the plaintiffs received for those hours was intended to enable them to take a vacation. In a third case, the Ninth Circuit held that, when an employer paid retiring employees for vacation days that the employees had not actually taken, those payments were also not on account of hours not worked due to vacation. *Hope v. Int'l Bhd. of Elec. Workers*, 785 F.2d 826, 830-31 (9th Cir. 1986). Of particular concern to the *Hope* court was the possibility that an employee who worked 52 weeks of the year would receive pension

---

reimburse[] an employee for medical or medically related expenses incurred by the employee"; and (4) clarify that a period of absence may qualify for credit under (a)(2) even if the payment is made indirectly by the employer through, for example, a trust fund or insurer to which the employer pays premiums.

credits for those weeks plus pension credits for the two weeks of vacation that he or she did not take, resulting in an award of more than 52 weeks of pension credit in one year.

All three courts that addressed the scope of (a)(2) based their decisions in large part on the fact that the credits the plaintiffs sought would result in double-counting of hours of service and crediting more than 52 weeks of service in one year. As plaintiffs have noted, such concerns are not relevant in this action, as the payments upon which plaintiffs base their (a)(2) claim were not calculated on the basis of hours actually worked but rather included actual time on layoff, for which they have not already received pension credit.

In the absence of case law directly on point, I turn to the language of the regulation itself, the regulatory history, and the context provided by other parts of § 2530.200b-2. I conclude that the word "payment" in (a)(2) encompasses only payments that compensate the employee for hours of lost working time by placing him or her in a position closer to the one that he or she would be in had he or she not experienced a layoff or other absence.

Subsection (a)(2) mandates pension credit for "each hour for which an employee is paid, or entitled to payment, by the employer on account of" a period of absence such as vacation or period of layoff. 29 C.F.R. § 2530.200b-2(a)(2). Subsection (a)(2)'s use of the phrase "paid, or entitled to payment" mirrors the wording of (a)(1), which encompasses "each hour for which an employee is paid, or entitled to payment, for the performance of duties for the employer," evincing a conceptual link between "payments" for the purposes of (a)(2) and an employee's regular compensation under (a)(1). *See id.* § 2530.200b-2(a)(1).

The method by which hours of service under (a)(2) must be calculated also supports my reading of (a)(2) as covering only periods of leave for which an employee receives payments to replace regular wages. According to 29 C.F.R. § 2530.200b-2(b), where payments under (a)(2)

are calculated on the basis of units of time, such as hours or weeks, as opposed to lump-sum payments,[15] the employee is credited with the number of hours of service that he or she would have received during that time. *Id.* § 2530.200b-2(b)(1). Thus, an employee who is paid at a percentage of his or her normal weekly rate during a period of disability leave earns credit for the number of hours of service that would ordinarily have accrued in three weeks of work, "regardless of the fact that payments to [the employee] . . . were made in amounts less than [the employee's] normal compensation." *See* 29 C.F.R. § 2530.200b-2(b)(1)(ii)(E).[16] "[A]n employee is not required to be credited on account of a period during which no duties are performed with a number of hours of service which is greater than the number of hours regularly scheduled for the performance of duties during such period." *Id.* § 2530.200b-2(b)(3). The calculation method is therefore designed to ensure that employees on paid leave earn the same kinds of benefits that they would have earned but for the period of leave; thus, when an employer endeavors to

---

[15] Lump-sum payments for absences include, by way of example, payments based on a schedule of injuries pursuant to a disability insurance plan. 29 C.F.R. § 2530.200b-2(b)(2)(iii). Because the plaintiffs in this action received distribution units for each month of layoff, their payments, if they were covered by (a)(2), would be considered payments based on units of time and therefore would be subject to the calculation provisions in (b)(1). Unlike the examples provided in (b)(1)(iii), however, plaintiffs' hourly rate of compensation was not a factor in the calculation.

[16] The interim regulation in place before the enactment of the present version of § 2530.200b-2 did distinguish between periods for which the employee was paid his or her normal salary and periods for which the employee was paid only a percentage of his or her salary. Under the interim regulation, the number of hours of service to be credited for a period of paid absence was determined by "dividing the amount of the payment by the lesser of the employee's most recent hourly rate of compensation or the average[,] crediting an employee with less than the number of working hours in a period during which the employee was compensated at less than the employee's normal rate." 41 Fed. Reg. at 56,465. The Secretary adopted the present formula in response to the concern that the interim rule "could result, in years when wages are rising, in the crediting of more hours of service than the number of working hours in the period during which no duties are performed." *Id.*

compensate an employee for leave by paying him or her some or all of the wages he or she would have earned during that time but for the absence, the employee should also receive the same kinds of benefits that he or she would have earned during that time. Indeed, all of the examples that the Secretary gives of payments on the basis of units of time refer to periods of paid vacation, paid sick leave, or paid disability leave, for which the employee received all or a significant percentage of his or her other regular wages. *See id.* § 2530.200b-2(b)(1)(ii).

Finally, the Secretary specifically excluded from the definition of hour of service in (a)(2) payments such as those reimbursing the employee "solely for medical or medically related expenses incurred," explaining that "such payments *do not compensate the employee for hours of working time* lost by the employee for medical reasons." 41 Fed. Reg. 56,462, 56,464 (Dec. 28, 1976) (emphasis added); *see also* 29 C.F.R. § 2530.200b-2(a)(2)(iii).

Excluding payments that do not replace lost wages from the scope of (a)(2) does not, as plaintiffs claim, eliminate any distinction between (a)(2) and (a)(3) and thus violate the rule of statutory construction requiring that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *See TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation and citation omitted). Subsection (a)(2) refers to periods of regularly paid leave, whereas subsection (a)(3) refers to periods for which the employer retroactively pays the employee, pursuant to settlement or adjudication of a dispute, wages that the employee "should have received but did not because of an employer's unlawful action . . . ." *See Black's Law Dictionary* 158-59 (9th ed. 2009) (definition of "backpay").

Nor is my reading of (a)(2) to encompass only payments that replace employees' regular wages equivalent, as plaintiffs suggest, to requiring such payments to be explicitly labeled as

giving rise to pension credit. It simply requires such payments to offset, in whole or in part, lost wages due to a period of absence.

### 5. Application of § 2530.200b-2(a)(2) to *Karan* Settlement Distributions

The Board of Trustees' findings with respect to the purposes behind the *Karan* settlement distributions necessarily lead to the conclusion that the payments plaintiffs received under the terms of that settlement were not covered by 29 C.F.R. § 2530.200b-2(a)(2). Because plaintiffs have not stated a plausible claim that those findings were an abuse of discretion, they cannot show that they are entitled to benefits under (a)(2).

The Appeals Committee found that the *Karan* settlement distributions were not "'intended to compensate [plaintiffs] for periods during which [they] would have been engaged in the performance of duties for [Nabisco],'" but rather that periods of layoff "were included in measuring the longevity in specific job classifications that was the determining factor in the distribution," were entitled to deference. (Plan Denial 2-3 (quoting Plan Rules & Regulations § 1.25).) The Appeals Committee reasoned that a formula "designed to compensate for periods of discriminatory layoff would assign more points to periods of layoff than to periods of actual work (because the class member had already received some compensation for periods of work, even if the amount was less than it should have been)." (Plan Denial 3.) The *Karan* settlement distribution formula, on the other hand, awarded the same number of distribution units for periods of layoff and for other absences that could not have been attributed to discrimination. (Plan Denial 3.) In other words, the settlement distributions attributable to periods of layoff had no relationship to class members' lost income resulting from those layoffs. Instead, the formula used overall longevity at each classification as a benchmark for assessing class members'

damages arising out of all of their combined claims. Each distribution unit, whether attributable to layoff or to active duty, represented an undifferentiated share in those combined damages.

I conclude that, on the facts as the Appeals Committee reasonably found them, plaintiffs are not entitled as a matter of law to pension credits under (a)(2). The distributions that plaintiffs received that were attributable to periods of layoff did not replace the wages that plaintiffs would have earned but for the layoffs, as plaintiffs would have received the same distributions if they had not been laid off but instead had continued to actually work during those periods.[17] As a result, the distributions were not payments on account of periods of layoff and I will grant defendants' motion for judgment on the pleadings.

**B. Summary Judgment**

A Rule 56 motion for summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). As I noted above, plaintiffs have failed to state a claim for which relief can be granted and are therefore not entitled to judgment as a matter of law. As a result, I will deny plaintiffs' motion for summary judgment.

**III. Conclusion**

The findings of the Appeals Committee regarding the structure of the *Karan* settlement distributions necessarily imply that those distributions were not payments for periods of layoff within the meaning of 29 C.F.R. § 2530.200b-2(a)(2). Plaintiffs have not stated a plausible claim

---

[17] Although it is true, as plaintiffs stress, that class members who experienced periods of layoff received distribution units whereas class members who were simply terminated did not, the appropriate comparison is to periods for which plaintiffs had already received some compensation, such as periods of actual work, not to periods during which plaintiffs had received no compensation, such as the period following termination.

that those findings were an abuse of discretion. As a result, plaintiffs have failed to state a plausible claim for relief. I will therefore grant defendants' motion for judgment on the pleadings and will deny plaintiffs' motion for summary judgment. An appropriate order follows.